Rebecca L. Hill, USB# 06246
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah  84111
Telephone:  (801) 323-5000
Facsimile:  (801) 355-3472
Email: rebecca.hill@chrisjen.com

*Attorneys for Plaintiffs American Economy*
*Insurance Company and American States*
*Insurance Company*

## UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF UTAH – CENTRAL DIVISION

| | |
|---|---|
| AMERICAN ECONOMY INSURANCE COMPANY, an Indiana Corporation, and AMERICAN STATES INSURANCE COMPANY, an Indiana Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> AQUATHERM L.P. a Delaware limited partnership, AETNA NA L.C. f/k/a AQUATHERM NA L.C., a Utah Limited Liability Company, AQUATHERM, INC., a Utah corporation, KING COUNTY, a Washington municipal corporation, ZURICH AMERICAN INSURANCE COMPANY, a New York corporation, and AMERICAN GUARANTEE LIABILITY INSURANCE COMPANY, a New York Corporation <br><br> Defendants. | **COMPLAINT FOR DECLARATORY RELIEF** <br><br><br> Case No.: 2:23-cv-00529-DAO <br> Judge: Daphne A. Oberg |

Plaintiffs, American Economy Insurance Company and American States Insurance

Company, by and through the undersigned counsel, hereby submit this Complaint for Declaratory

Relief and alleges as follows:

## **PARTIES**

1.      Plaintiff American Economy Insurance Company ("AEIC") is a corporation organized under the laws of the State of Indiana, with its principal place of business located in Boston, Massachusetts.

2.      Plaintiff American States Insurance Company ("ASIC") is a corporation organized under the laws of the State of Indiana, with its principal place of business located in Boston, Massachusetts.

3.      Defendant Aquatherm L.P. is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Lindon, Utah.

4.      Defendant Aetna NA L.C., f/ka/ Aquatherm NA L.C. ("Aquatherm NA L.C.") is a limited liability company organized under the laws of the State of Utah.  Members of Aetna NA L.C. are residents of Utah.

5.      Defendant Aquatherm, Inc. is a corporation organized under the laws of the State of Utah.

6.      Defendants Aquatherm L.P., Aquatherm NA L.C. and Aquatherm, Inc. (collectively the "Aquatherm U.S. Entities") were or are entities having their principal places of business located in Lindon, Utah, and upon information and belief, conducted or conduct the business of selling, supplying, advertising and/or distributing Aquatherm Pipe in the United States.

7.      Upon information and belief, the Aquatherm Pipe which the Aquatherm U.S. Entities sold, supplied, advertised and/or distributed during all relevant times of this controversy

was Aquatherm Pipe manufactured, produced, fabricated, made and/or designed by Aquatherm GmbH, a corporation organized under foreign laws with its principal place of business located in Attendorn, Germany.

8.      Defendant King County is a municipal corporation organized under the laws of the State of Washington, with its principal place of business located in Seattle, Washington

9.      Defendant Zurich American Insurance Company ("ZAIC") is a corporation organized under the laws of the State of New York, with its principal place of business located in Schaumburg, Illinois.

10.     Defendant American Guarantee and Liability Insurance Company ("AGLIC") is a corporation organized under the laws of the State of New York, with its principal place of business located in Schaumburg, Illinois.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Jurisdiction and venue are proper in this Court under 28 U.S.C. § 1391(a) because: 1) this controversy relates to insurance policies which were issued in this judicial district to insureds whose principal place of business is located in Lindon, Utah; 2) the question of insurance concerns defense and indemnification of the Underlying Suit which involved the sale and distribution of products from the insureds located in Utah to Defendant King County; and 3) Defendant King County has obtained a Judgment against some of the insureds which have or may

have assets located in Utah, including the insurance policies issued to them in Utah.

## FACTUAL ALLEGATIONS

### A.  Insurance Policies Issued To Aquatherm U.S. Entities

#### 1.  AEIC Issues Primary Businessowners Insurance Policies to Aquatherm U.S. Entities

13.    AEIC issued Businessowners Policies to named insureds Aquatherm, Inc. and Aquatherm NA, L.C., Policy No. 02-BP-613352. for six consecutive annual policy periods ("BOP Policies") from 7/11/2011 to 10/1/2016, when the last 2016/2017 policy was cancelled.

14.    Defendant Aquatherm L.P. was added as a named insured to the BOP Policies for the period of 12/26/2015 to 10/1/2016.

15.    The BOP Policies were issued and delivered to the named insureds' address of 500 W. 500 S. Bldg. 1, Lindon, Utah 84042.

16.    The listed Independent agent of the BOP Policies issued to the named insured is Infiniteam Insurance, Inc., and that agent is located in Sandy, Utah.

17.    The BOP Policies each provide liability insurance coverage with limits of $2,000,000 each occurrence and $4,000,000 Aggregate, and each contain the Businessowners Coverage Form,  BP 00 03 01 06, entitled Businessowners Coverage Form.  A copy of the BOP Policy for the policy period 7/11/2015 to 7/11/2016, containing the Businessowners Coverage Form, is appended hereto as Exhibit A.

18.    The BOP Policies' insuring provisions for business liability, contained within the Businessowners Coverage Form, provide, in relevant part:

4

**SECTION II – LIABILITY**

**A. COVERAGES**

   **1. Business Liability**

      **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage", or "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        **(1)** The amount we will pay for damages is limited as described in Paragraph D – Liability And Medical Expenses Limits Of Insurance in Section II – Liability; and

        **(2)** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements or medical expenses.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph f. Coverage Extension – Supplementary Payments.

      **b.** This insurance applies:

        **(1)** To "bodily injury" or "property damage," only if:

          **(a)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

          **(b)** The "bodily injury" or "property damage" occurs during the policy period; and

          **(c)** Prior to the policy period, no insured listed under Paragraph C.1. Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily

injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such the "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

*     *     *     *

c.  "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of "bodily injury" or "property damage" after the end of the policy period.

d.  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur. . . .

Businessowners Coverage Form, BP 00 03 01 06, at pp. 32-33- of 52, Exhibit A.

       19.    The BOP Policies define the following terms which are used in the liability insuring

provision and other liability provisions relevant to this controversy:

   **F.  Liability And Medical Expenses Definitions**

*     *     *     *

**8.**  "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or is less useful because:

a.  It incorporates "your product" or "your work" that is known or thought to be

       defective, deficient, inadequate or dangerous; or

   **b.**  Your have failed to fulfill the terms of a contract or agreement;

If such property can be restored to use by:

    **(1)**  The repair, replacement, adjustment or removal or "your product" or "your work"; or

    **(2)** Your fulfilling the terms of the contract or agreement.

              *     *     *     *

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

              *     *     *     *

**16.** "Products-completed operations hazard":

   **a.**  Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    **(1)** Products that are still in your physical possession; or

    **(2)** Work that has not yet been completed or abandoned.  However "your work" will be deemed completed at the earliest of the following times:

      **(a)**  When all of the work called for in your contract has been completed.
      **(b)**  When all of the work to be done at the site has been completed if your contract calls for work at more than one job site.
      **(c)**  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed. . . .

**17.** "Property damage means:

   **a.**  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*      *      *      *

**21.** "Your Product"

   **a.** Means:

      **(1)** Any goods or products other than real property, manufactured, sold, handled, distributed or disposed of by:

         **(a)** You;

         **(b)** Others trading under your name; or

         **(c)** A person or organization whose business or assets you have acquired; and

      **(2)** Containers (other than vehicles, materials, parts or equipment furnished in connection with such goods or products.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product" and

      **(2)** The providing of or failure to provide warnings or instructions.

   **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your Work"

   **a.** Means:

      **(1)** Work or operations performed by you or on your behalf; and

      **(2)** Materials or Parts, parts or equipment furnished in connection with such work or operations.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness,

8

quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

*Id*. at pp. 45-49; Exhibit A.

20.    The BOP Policies contain several exclusions applying to liability coverage and the relevant exclusions to this controversy are:

**B.   Exclusions**

**1.  Applicable to Business Liability Coverage**

This insurance does not apply to:

\*         \*         \*         \*

**k.   Damage to Property**

"Property damage" to:

\*         \*         \*         \*

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

\*         \*         \*         \*

Paragraphs **(3), (4), (5)** and **(6)** of the paragraph of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products completed operations hazard."

**l.   Damage to Your Product**

"Property Damage" to "your product" arising out of it or any part of it.

**m.  Damage to Your Work**

"Property damage" to "your work" arising out of or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**o. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

*Id*. at pp. 35, 39-40; Exhibit A.

**2. ASIC Issues Ultra Catastrophe Liability Policies to the Aquatherm U.S. Entities.**

21.     ASIC issued Ultra Catastrophe Liability Policies providing excess liability

insurance to named insureds Aquatherm, Inc. and Aquatherm NA, L.C., Policy No. 01-CT-128525,

for six consecutive policy periods ("Excess Policies") from 2/01/2012 to 10/1/2016, when the last 2016/2017 policy was cancelled.

22.     Defendant Aquatherm L.P. was added as a named insured to the Excess Policies for the period of 12/01/2015 to 10/01/2016.

23.     The Excess Policies were issued and delivered to the named insureds' address of 500 W. 500 S. Bldg. 1, Lindon, Utah 84042.

24.     The listed Independent agent of the Excess Policies issued to the named insured is Infiniteam Insurance, Inc., and that agent is located in Sandy, Utah.

25.     The Excess Policies each provide limits of $3,000,000 for liability in excess of "underlying limits" as defined by the Policies, and each contain the Ultra Catastrophe Liability Coverage Form, CT 70 01 07 05.  A copy of the Excess Policy for the policy period 7/11/2015 to 7/11/2016, containing the Ultra Catastrophe Liability Coverage Form, is appended hereto as Exhibit B.

26.     The Excess Policies' insuring provisions, contained within the Ultra Catastrophe Liability Coverage Form, provide in relevant part:

**SECTION I – COVERAGE**

We will pay those sums that the insured becomes legally obligated to pay as damages in excess of "underlying limits" because of:

   **A.**  "Bodily Injury" or "property damage"; or

   **B.**  "Personal injury" or "advertising injury"

to which this insurance applies.

Our right and duty to defend is limited as set forth in Section VI – Defense and Supplementary Payments.  However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in this coverage form.

This insurance applies only to:

    **A.** "Bodily injury" or "property damage" if the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" and the "bodily injury" or "property damage" occurs during the policy period

    **B.** "Personal injury" or "advertising injury" if the "personal injury" or "advertising injury" is caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

Ultra Catastrophe Liability Coverage Form at pp. 3 of 17; Exhibit B.

    27.    The Excess Policies define the following terms which are used in the liability insuring provision and other liability provisions relevant to this controversy:

**SECTION VII – DEFINED WORDS AND PHRASES**
*    *    *    *

**L.** "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or is less useful because:

    **1.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    **2.** You have failed to fulfill the terms of a contract or agreement;

If such property can be restored to use by:

    **1.** The repair, replacement, adjustment or removal or "your product" or "your work"; or

    **2.** Your fulfilling the terms of the contract or agreement.
*    *    *    *

**Q.** "Occurrence" means an accident, including continuous or repeated exposure to

12

substantially the same general harmful conditions, an offense, incident, error or omission or other negligent act resulting in injury or damage not otherwise excluded by this policy.

*    *    *    *

**T.** "Products-completed operations hazard":

    **1.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **a.** Products that are still in your physical possession; or

        **b.** Work that has not yet been completed or abandoned.  However "your work" will be deemed completed at the earliest of the following times:

            **(1)** When all of the work called for in your contract has been completed.
            **(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one job site.
            **(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
        . . . .

**U.** "Property damage means:

    **1.** Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **2.** Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*    *    *    *

**W.**  "Scheduled Underlying Insurance" means the limits of insurance and coverages listed in the Schedule of Underlying Insurance.  It includes any renewal or replacement of such contracts.

*    *    *    *

**Z.**  "Underlying Insurance" means "scheduled underlying insurance" and liability insurance coverage provided by any other insurance policy or contract available to the

13

insured, provided the "underlying limits" are equal to or greater than the "underlying limits" of the "scheduled underlying insurance" for the same types of coverages. "Underlying insurance" does not include insurance specifically purchased to apply in excess of this policy's limits of insurance.

*      *      *      *

**AB.**   "Underlying limits" means "underlying insurance" or the "retained limit" for damages to which this insurance applies.

**AC.**   "Your Product" means:

   **1.**   Any goods or products other than real property, manufactured, sold, handled, distributed or disposed of by:

   **a.**   You;

   **b.**   Others trading under your name; or

   **c.**   A person or organization whose business or assets you have acquired; and

   **2.**   Containers (other than vehicles, materials, parts or equipment furnished in connection with such goods or products.

   "Your Product" includes:

   **1.**   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product" and

   **2.**   The providing of or failure to provide warnings or instructions.

   "Your Product" does not include vending machines or other property rented to or located for the use of others but not sold.

**AD.**   "Your Work" means

   **1.**   Work or operations performed by you or on your behalf; and

   **2.**   Materials or Parts, parts or equipment furnished in connection with such work or operations.

   "Your Work" includes:

14

1. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

2. The providing of or failure to provide warnings or instructions.

*Id*. at pp. 13-17; Exhibit B.

28.     The Excess Policies contain several exclusions precluding coverage and the relevant exclusions to this controversy are:

**SECTION II – EXCLUSIONS AND LIMITATIONS**

This insurance does not apply to:

\*       \*       \*       \*

**M.** "Property damage" to:

\*       \*       \*       \*

5. That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations.   This paragraph does not apply to liability assumed under a sidetrack agreement; or

6. That particular part of property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.   This paragraph (6) does not apply to "property damage" included in the "products-completed operations hazard" or to liability assumed under a sidetrack agreement.

**N.** "Property damage" to "your product" arising out of it or any part of it.

**O.** "Property damage" to "your work" arising out of or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**P.** "Property damage" to "impaired property" or property that has not been physically injured arising out of:

1. A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**2.** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**Q.** Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**1.** "Your product";

**2.** "Your work"; or

**3.** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

*Id*. at pp. 3, 5 of 17; Exhibit B.

### 3. ZAIC and AGLIC Issue liability insurance to the Aquatherm U.S. Entities.

29.     Upon information and belief, beginning sometime in 2016, ZAIC issued primary insurance policies to one or more of the Aquatherm U.S. Entities which provide liability coverage.

30.     Upon information and belief, ZAIC issued several consecutive annual policies, Policy No. GLO 0144270, to Aquatherm LP and Aquatherm NA L.C., providing primary liability coverage, for a period of time beginning sometime in 2016 and ending sometime in 2019.

31.     Upon information and belief, ZAIC issued and delivered the policies to the named insureds' address in Lindon, Utah.

32.     Upon information and belief, the insurance policies issued by ZAIC to Aquatherm

LP and Aquatherm NA L.C. provide primary liability coverage which have similar provisions and exclusions contained within the policies issued by AEIC.

33.     Upon information and belief, AGLIC issued several consecutive annual policies to one or more of the Aquatherm U.S. Entities, under Policy No. AUC 0144271, providing excess liability coverage, for a period of time beginning sometime in 2016 and ending sometime in 2019.

34.     Upon information and belief, ZAIC issued and delivered the excess policies to the named insureds' address in Lindon, Utah.

35.     Upon information and belief, the insurance policies issued by AGLIC to one or more of the Aquatherm U.S. Entities provide excess liability coverage which have similar provisions and exclusions contained within the policies issued by ASIC.

**B.     The Underlying Lawsuit**

**1.    King County Complaint Allegations**

36.     On or about March 20, 2019, Defendant King County, as Plaintiff, filed a lawsuit in the Superior Court of the State of Washington, King County, styled *King County v. Aquatherm GMBH et al*, Case No. 19-2-07910-0 SEA ("Underlying Suit"), seeking recovery of damages allegedly caused by failure of polypropylene pipe ("PPR/Aquatherm Pipe or PPR Pipe"), which was installed in the domestic potable water system at the King County Correctional Facility located at 500 5th Avenue in Seattle, Washington ("KCCF").  *See* Second Amended Complaint, a copy of which is appended hereto as Exhibit C.[1]

---

[1] King County filed a number of Complaints in the Underlying Suit and the last and operative Complaint is the Second Amended Complaint filed in March 2022.

37.     In the Underlying Suit, King County sues a number of defendants which manufactured, supplied and/or installed the PPR Pipe at KCCF and those defendants are: 1) Aquatherm GmbH, a German entity which designed and manufactured the PPR Pipe; 2) the Aquatherm U.S. Entities, for those entities' alleged distribution, sale, supply, marketing and promotion of the PPR Pipe; and 3) Ridgeline Mechanical Sales LL.C. and Harrington Industrial Plastics, Inc., for their alleged installation of the PPR Pipe.  *See id.* at ¶¶ 2-8, Exhibit C.

38.     King County alleges and acknowledges in the Underlying Suit that Aquatherm, Inc. and Aetna NA L.C. f/d/a Aquatherm NA L.C. are entities organized under the laws of the State of Utah.  *See id.* at ¶¶ 5-6, Exhibit C.

39.      King County alleged the following allegations in the Factual Background section of its Second Amended Complaint which are relevant to the Aquatherm U.S. Entities:

24.     King County is the owner of the Project.  The Project is located at 500 5th Avenue in Seattle, Washington and is operated by the King County Department of Adult and Juvenile Detention.   The Project is a critical part of the County's infrastructure and of its administration of criminal justice.  The facility's ongoing operations are vital to the criminal justice system as the facility houses person awaiting trial as well as persons convicted of crimes.  As present there are more than 1,000 people housed in the facility.

25.     In or around 2011-2012, the existing potable cold, hot, and hot circulating steel and copper piping systems at the Project were removed and replaced with new portable cold, hot and hot circulating PPR poly propylene water piping, including new piping accessories and piping insulation.

                    *       *       *       *
             [Paragraphs 26 & 27 concern Wood Harbinger's work]
28.     In connection with construction of the Project, the Aquatherm Pipe was supplied, finished, and/or installed at the Project as part of its domestic water plumbing system as a direct result of defendants Aquatherm GmbH, Aquatherm L.P., Aetna Na L.C., and/or Aquatherm, Inc. placing the Aquatherm Pipe into the stream of commerce and advertising, promoting, marketing, and/or supplying the

Aquatherm Pipe for installation in buildings in the United States, Washington State, and King County, by and through and in collaboration with defendant Aquatherm GmbH's distribution and supply and/or defendant Aquatherm GmbH's subsidiaries, partners and/or affiliates.

\*    \*    \*    \*

[Paragraphs 29-30 concern Ridgeline's work]

31.    Between March and September 2012, Auburn Mechanical performed several successful pressure tests on the installed Aquatherm Pipe in various locations at the Project and submitted proof of these successful pressure tests to Defendants Aetna NA L.C. and/or Aquatherm, Inc., as required by Aquatherm GmbH Warranty.

32.    After fulfillment and satisfaction of the all conditions precedent, on November 30, 2012, Defendant Aetna NA, L.C. (doing business at Aquatherm NA L.C. at the time) issued at least seven separate 10-year €15 million Aquatherm GmbH Warranties to King County for the Project.   The Aquatherm GmbH warranties cover different areas of the Project where the pressure tests has been successfully completed:

- **Warranty # 1:** Phasar DHW & Greenpipe DCW 1st Floor Mains & Wall
  - ° Pressure test dated:  June 21, 2012
  - ° Warranty expires: June 21, 2022
  - ° Attached hereto as Exhibit A-1

- **Warranty # 2:** Phasar DHW & Greenpipe DCW 2nd  Floor Court Detail
  - ° Pressure test dated:  May 15, 2012
  - ° Warranty expires: May 15, 2022
  - ° Attached hereto as Exhibit A-2

- **Warranty # 3:** Phasar DHW & Greenpipe DCW 3rd Floor ITR Mains
  - ° Pressure test dated:  June 12, 2012
  - ° Warranty expires: June 12, 2022
  - ° Attached hereto as Exhibit A-3

- **Warranty # 4:** Phasar DHW & Greenpipe DCW 5th  Floor Mains Officer
  - ° Pressure test dated:  March 14, 2012
  - ° Warranty expires: March 14, 2022
  - ° Attached hereto as Exhibit A-4

- **Warranty # 5:** Phasar DHW & Greenpipe DCW 5th Floor Kitchen & administrative Area Mains

- ° Pressure test dated:  March 1, 2012
- ° Warranty expires: March 1, 2022
- ° Attached hereto as Exhibit A-5

- **Warranty # 6:** Phasar DHW & Greenpipe DCW 6th Floor Clinic & 7th Floor Infirmary Mains
  - ° Pressure test dated:  May 29, 2012
  - ° Warranty expires: May 29, 2022
  - ° Attached hereto as Exhibit A-6

- **Warranty # 7:** Phasar DHW & Greenpipe DCW East & North & South Cell Towers
  - ° Pressure test dated:  September 27, 2012
  - ° Warranty expires: September 27, 2022
  - ° Attached hereto as Exhibit A-7

33.     The Aquatherm GmbH Warranties issued to King County are backed by business liability and product liability policies issued by Zurich Insurance (policy number 813090316983) which provided up to €15 million in coverage for personal injury and destruction of property resulting from defective products manufactured by defendant Aquatherm GmbH.  The Aquatherm GmbH Warranties issued by Defendant Aquatherm GmbH to King County for the Project are in effect for a period of 10 years from the date of the pressure tests performed at the Project.

34.     The Project has experienced and continues to experience physical damage, harm, risk of harm, unsafe conditions, sudden and dangerous failures in its pressurized domestic water plumbing system, and other damages and loses caused by design, material, and/or manufacturing defects in the Aquatherm Pipe supplied, furnished, and/or installed at the Project by defendants Aquatherm GmbH, Aquatherm L.P., Aetna NA L.C., Aquatherm, Inc., Ridgeline and Harrington.  As a result King County has incurred and will incur costs, damages, losses, expenses, and/or liabilities, including but not limited to water damage and other physical damage to the Project, diminution of value, loss of use, business interruption damages, investigation, testing and destructive testing costs, consulting and attorney fees, repair and replacement costs and other costs, expenses and liabilities.

35.     These damages, losses, costs, expenses and/or liabilities were proximately caused by and result from the negligence, professional negligence, strict liability, negligent design, errors and omissions, failure to adhere to professional or industry standards, failure to manufacture a product that was reasonably safe, failure to warn, breach of contractual duties, breach(es) of warranties of design and

workmanship, breach(es) of express and/or implied warranties, and/or intentional misrepresentation/concealment by defendants.

*Id*. at ¶¶ 24-35, Exhibit C.

40.     The Warranty Receipts attached to the Second Amended Complaint are signed by Steven J. Clark, CEO of Aquatherm, Inc. and Aquatherm's address identified on the Warranty Receipts is 500 S 500 W, Lindon, UT 84042. *See id.* Exhibits A-1 through A-7, Exhibit C.

41.     King County asserted in its Second Amended Complaint causes of action against the Aquatherm U.S. Entities of: 1) Product Seller Liability under the Washington Product Liability Act (7.72.040); and 2) Violations of the Washington Consumer Protection Act (RCW 19.86). *See id*. at ¶¶ 46-54, 61-68, Exhibit C.

42.     King County's cause of action for Product Seller Liability asserted against the Aquatherm U.S. Entities provides:

47.     Defendants Aquatherm L.P., Aetna NA L.C., [Aquatherm NA L.C.] Aquatherm, Inc., Ridgeline and Harrington are product sellers within the meaning of the Washington Product Liability Act (the "WPLA"), RCW 7.72.010(1), because defendants Aquatherm L.P., Aetna Na L.C., Aquatherm, Inc., Ridgeline, and Harrington, and each of them are engaged in the business of distributing, selling, promoting, marketing, and advertising Aquatherm Pipe.

48.     The Aquatherm Pipe distributed, sold, promoted, marketed, and/or advertised by defendants Aquatherm L.P., Aetna NA L.C., Ridgeline and Harrington is product within the meaning of the WPLA and as defined by RCW 7.72.010(3).

49.     King County is a claimant within the meaning of the WPLA and as defined by RCW 7.72.010(5).

50.     Defendants Aquatherm L.P., Aetna NA L.C., [Aquatherm NA L.C.] Aquatherm, Inc., Ridgeline and Harrington are subject to product seller liability under WPLA, RCW 7.72.040(1)(a) and (b), because the harm to King County was

21

proximately caused by defendants Aquatherm L.P., Aetna NA L.C., [Aquatherm NA L.C.] Aquatherm, Inc., Ridgeline and Harrington's negligence, negligent representations, negligent misrepresentations and/or omissions, and/or breaches of express warranties regarding the quality, longevity, compatibility, and/or suitability of the Aquatherm Pipe in the distribution, sale, promotion, marketing, and/or advertisement of the Aquatherm Pipe which was supplied and/or furnished by defendants Aquatherm L.P., Aetna NA L.C., [Aquatherm NA L.C.] Aquatherm, Inc., Ridgeline and Harrington for the Project.

51.     As a direct and proximate result of defendants Aquatherm L.P., Aetna NA L.C., [Aquatherm NA L.C.] Aquatherm, Inc., Ridgeline and Harrington's negligence, negligent representations, negligent misrepresentations and/or omissions, and/or breaches of express warranties regarding the quality, longevity, compatibility, and/or suitability of the Aquatherm Pipe, King County has incurred and/or will incur damages, costs, losses, expenses, and/or liabilities, including but not limited to consultant and attorney fees and legal costs for which defendants Aquatherm L.P., Aetna NA L.C., [Aquatherm NA L.C.] Aquatherm, Inc., Ridgeline and Harrington are liable to King County, in amounts to be proven at trial.

52.     Defendants Aquatherm L.P., Aetna NA L.C., [Aquatherm NA L.C.] Aquatherm, Inc., Ridgeline and Harrington also are subject to product seller liability under the WPLA, RCW 7.72.040(2), to the extent Aquatherm GmbH is deemed not subject to service of process under the laws of the State of Washington or the court deems that is highly probable that King County would be unable to enforce a judgment against Aquatherm GmbH.

53.     Aquatherm GmbH contends that it is not subject to personal jurisdiction in King County.

54.     Aquatherm GmbH further has been named as a defendant in multiple other pending lawsuits that also seek damages for product liability claims as well as investigations of Aquatherm pipe product failures.  To the extent such lawsuits and investigations effect the financial solvency of Aquatherm GmbH, Defendants Aquatherm L.P., Aetna NA L.C., [Aquatherm NA L.C.] Aquatherm, Inc., Ridgeline and Harrington are subject to product seller liability.

*Id.* at ¶¶ 48-54, Exhibit C.

### 2. The Aquatherm U.S. Entities Tender the Underlying Suit to Its Insurers

43.     Shortly after the Aquatherm U.S. Entities were served with the original Complaint

filed in the Underlying Suit, the Aquatherm Entities tendered the Underlying Suit to its insurers, including AEIC and ZAIC.

44.     AEIC accepted the Aquatherm U.S. Entities' tender of the Underlying Suit agreeing to defend the entities subject to and providing a reservation of rights letter which fully and completely reserves ZAIC's right to disclaim coverage because some or all of the claims asserted against the Aquatherm U.S. Entities are not covered by the BOP Policies.  *See* Letter from Cindy Minetti to Aquatherm, Inc. and Aetna, NA, L.C., dated April 26, 2019; and Letter from Richard Buckley to Aquatherm L.P., dated April 24, 2019.

45.     AEIC retained the law firm of Wilson Smith Cochran Dickerson to represent and defend the Aquatherm U.S. Entities in the Underlying Suit.

46.     Upon information and belief, ZAIC accepted the Aquatherm U.S. Entities' tender of the Underlying Suit agreeing to defend the entities subject to and providing a reservation of rights letter to the Aquatherm U.S. Entities.

47.     Upon information and belief, ZAIC retained the law firm of Betts, Patterson & Mines, P.S. ("Betts Firm") to represent and defend the Aquatherm LP jointly with Aquatherm GmbH.  The Betts Firm also represented Aquatherm Inc. and Aquatherm NA, L.C. jointly with Aquatherm GmbH and Aquatherm LP.

48.     Additionally, there is an agreement between AEIC, ZAIC and Aquatherm GmbH for sharing in and apportioning payment of attorneys' fees and costs of defending the Aquatherm U.S. Entities.

### 3.  Evidence Disclosed And Provided During Discovery Of The Underlying Suit.

49.     During discovery of the Underlying Suit, the parties produced many documents and witnesses concerning the alleged liability of the defendants, including the Aquatherm U.S. Entities, and the alleged damages sustained by King County arising out of the installation of PRP/Aquatherm Pipe in the domestic potable water system of the KCCF.

50.     One document produced during discovery was a report prepared by Jensen & Hughes, an expert engineering firm retained by King County, which investigated the leaks of the PRP/Aquatherm Pipe.  The report sets forth a timeline of KCCF Aquatherm Piping Failure.  *See* KCCF Aquatherm Piping Failure Timeline Report ("Timeline Report"), a copy of which is appended hereto as Exhibit D.

51.     The first page of the Timeline Report provides a summary of the findings:

**KCCF AQUATHERM PIPING FAILURE TIMELINE**

Jensen Hughes constructed a timeline of Aquatherm piping installation and failure based on the documents reviewed (Table 1)  We color coded Table 1 to break the reported leak history into three groups, including:

**Group 1** – Early leaks that do not appear to be copper-catalyzed thermo-oxidation. Three of the four Group 1 leaks occurred within the first year after insulation.  We shaded the Group 1 failures light green.

**Group 2** – Based on Aquatherm Reports, some images, and email communications, we believe that this population of Aquatherm pipes failed due to copper-catalyzed thermo-oxidation.  This group of failures all occurred in 2015 prior to the Aquatherm warranty work in early 2016 to remove the copper tubing that was left ('new') in place during the original Aquatherm piping installation.  A section of Aquatherm pipe that had been installed in the high-pressure tank feed line from the high-pressure heat exchanger to the high-pressure tank, apparently failed from copper catalyzed thermo-oxidation after three years in service, and had to be replaced.  We shaded the Group 2 failures light yellow.

> **Group 3** – This population of Aquatherm pipe failures are believe [sic] to be, or are known to be, copper-catalyzed thermo-oxidation. This population of Aquatherm pipe failures all occurred after the 2016 Aquatherm warranty replumb. Included in this group are pipes that Jensen Hughes has in custody that were included in the September 2019 Joint Evidence Examination. We shaded the Group 3 failures in red.

Failure Report at p. 1, Exhibit D.

52.    Another document produced during discovery is an Execution Determination signed by Dow Constantine, King County Executive, which sets forth King County's finding of alleged degradation of the PRP/Aquatherm Pipe and determination of need for repair of the water system of the KCCF. *See* Executive Determination Of Emergency And Waiver From Competitive Procurement and Solicitation Requirements For The King County Correctional Facility Domestic Water Pipe System ("Executive Determination"), a copy of which is appended hereto as Exhibit E.

53.    The Executive Determination, dated April 16, 2019, explains King County's findings and provides an emergency waiver from competitive bidding to repair and replace the domestic water pipe system in the KCCF, stating in relevant part:

> WHEREAS, the domestic water distribution system in the King County Correctional Facility (KCCF) provides the potable hot and cold water for the facility; and
>
> WHEREAS, the domestic water distribution system is necessary to occupy the building. When properly functioning, the domestic water distribution system provides a safe and useable source of potable water for the KCCF staff, inmates, and the visiting public. If the system does not function properly, the facility cannot provide water to the occupants that would enable King County to safely operate the building and house the inmates as required by law; and,

WHEREAS, the Facilities Management Division (FMD) replaced the original steel and copper domestic pipes in or around 2011-2012 with new PPR poly propylene water pipe manufactured by Aquatherm, GmbH, a German Corporation (Aquatherm); and

WHEREAS, FMD first started observing water leaks in the PPR polypropylene water pipe in 2015 that appeared to show degradation of the pipe. The PPR polypropylene water pipe has continued to develop sudden and significant leaks ever since. Before March 22, 2019, the leaks were repaired at no cost to King County under warranties issued by Aquatherm. On March 22, 2019, Aquatherm's local distributor informed FMD that it would no longer cover the cost of repairing the PPR polypropylene water pipe because King County had filed a lawsuit against Aquatherm and its subsidiaries seeking to recover costs and damage for the installation of the defective pipe, and

WHEREAS, the sudden possibility of failure in the PPR polypropylene water pipe in the KCCF and the potential impacts posed by such a failure, constitutes an unforeseen circumstance beyond the County's control that presents a real and immediate threat to the proper performance of an essential government facility, and will likely result in material loss or damage to property and injury to persons unless expeditious action is taken to repair the KCCF domestic water distribution system in case of a sudden failure; and

WHEREAS, an emergency waiver of competitive bidding and formal solicitation requirements of state and county law is necessary to assure the timely procurement of construction services, materials and equipment necessary to repair the PPR polypropylene water pipe in case of sudden failure in the system.

WHEREAS, FMD is reviewing various long term options for the design and construction of a replacement material for the domestic water pipe system in the KCCF and will submit a formal budget request in the near future for this work.

Executive Determination at pp. 1-2, Exhibit E.

54.     Following issuance of the Executive Determination, King County undertook the project of removing of all of the existing Aquatherm Pipe that was part of the KCCF domestic water distribution system and replaced it with stainless steel and copper product ("Project").

55.     Upon information and belief, the Project took place over a two-year period,

beginning in 2020 and finishing sometime during the latter part of 2022.

56.     King County retained Ronald A. Maus as one of its experts providing opinions regarding the expectations of King County when it chose to use PRP/Aquatherm Pipe as replacement of the original pipe of the KCCF domestic water distribution system; and the damages King County allegedly sustained from the alleged failure of the PRP/Aquatherm Pipe.

57.     In the latter part of 2022, King County produced an Updated Expert Report of Ronald A. Maus.  *See* Updated Expert Report of Ronald A. Maus, dated August 25, 2022 ("Updated Damage Report"), a copy of which is appended hereto as Exhibit F.

58.     As it relates to overall damages, Mr. Maus' Updated Damage Report contains the following opinion:

> **Opinion 3:  The damages that King County is asserting in this matter are predicated on three basic elements: 1) past (otherwise avoidable) expenditures, stated at their cost, plus an amount added for prejudgment interest; 2) currently identified and expected expenditures, supported by budgetary data and evidence of the contracting undertaken to perform the current replacement Project; and 3) future replacement of the current Project work.**

Updated Damage Report at pp. 11-12 of 34, Exhibit F.

59.     Mr. Maus thereafter stated that with respect to the first item of past damages, King County will not be able to pursue such damages:

> With respect to what I term past damages, which would include those between the time of the original installation and those up to the current Project timeframe [2020-2022 replacement], the County will not be able to pursue these damage amounts. Due to Covid-19 issues, which have affected budget, staffing, allocation of available staff resources, and ultimately, the ability on the part of the County to provide us with current support necessary to present such amounts, we are unable to perform the work that we consider as appropriate to support an opinion with respect to the correct value of such damages to be sought.

*Id*. at p. 12 of 34 (footnotes omitted), Exhibit F.

60.     Regarding the second item of current damages, Mr. Maus provided the following

opinion in the Updated Damage Report:

> **Opinion 4:  Based upon the information made available to me regarding the spend by King County on the project effort, as tempered by consideration of elements of work that may have been additive or betterment in nature, I have computed the amount for the "current damages" of King County.  It is my view that King County's current (and past) damages are an amount no less than $18,063,850.**

*Id*. at p. 13 of 34, Exhibit F.

61.     Mr. Maus explains the above opinion of current damages for thirteen pages of the

report and that explanation includes the following summary information:

> King County records – as well as the tracking prepared by and supported for project management purposes by OAC – indicate that the Aquatherm replacement project incurred $18,210,158 through July 31, 2022.  We adjust this cost to reflect items that are identified as being out of the necessary scope to efficiently replace the Aquatherm pipe; we fully rely upon others to identify and set forth the proper cost of performing that work.   Additionally, we make certain other adjustments, intended to be conservative in nature, for the cost of King County personnel involved in support of the project.
>
> *     *     *     *
>
> Review of the $18,210,158 in costs of the project from a cost source perspective indicates there are obvious costs drivers – UMC is to be paid $13,394,125 (less the $5,112 credit listed at the end of the opinion) for work on the re-piping; OAC[2] $1,787,187; DLR Group[3] $1554,350; and King County Salaries, Wages and related costs totaled $1,059,371 ($935,139 + $53,026 + $58783 + 12,423) as the most cost drivers, addressing nearly 98% of the total incurred.
>
> *     *     *     *
>
> [discussion of costs of betterment or costs unrelated to the Project]

---

[2]  King County retained OAC Services as the outside project management firm to perform the numerous functions in the construction management/contract administration for the Project.

[3]  King County retained DLR Group as the design/architecture/engineering firm for the Project.

After consideration of the above items, we then revised the total being sought for this damage amount to reflect the total incurred cost of July 31, 2022 – as part of the re-piping cost within the King County records – of $18,210,158 less the project items listed above in the amounts of $66,482, less the $74,714 allocation attributable to King County personnel costs for the hot water tank project, and less the small close-out credit of $5,112 provided by UMC. This results in the revised computation of damages for this item of $18,063,850.

*Id*. at pp. 16, 17-18, 22 of 34 (footnotes omitted), Exhibit F.

62. Regarding the second item of current damages, Mr. Maus provided the following opinion in the Updated Damage Report:

**Opinion 5: To the extent that King County should seek to assert that Aquatherm product should have lasted through the expected life of the Facility, it is clear that an additional replacement project will have to take place. Assuming another replacement project is in fact necessary, it is conservatively safe to assert that the current value of this damage amount would be at least as much as the claim value set forth in Opinion 4.**

*Id*. at p. 22 of 24, Exhibit F.

63. The Defendants in the Underlying Suit disputed Mr. Maus' opinions primarily through the expert report and testimony of Mark J. Lawless of Construction System Management, Inc.

64. In Mr. Lawless' supplemental expert report, he opined that a significant portion of the cost of the Project which King County undertook in 2020-2022 (King County's current damage claim of $18,036,850) is actually modernization and betterment, and not damage attributable to the alleged failure of the PRP/Aquatherm Pipe, assuming King County could prove the Pipe was defective. Mr. Lawless then provided an adjusted cost for the Project, as a claim for damage, of $11,702,753.19. *See* CSMI Supplemental Report, dated September 27, 2022 as pp. 53-54 of 57.

### 3.   The Trial Of The Underlying Suit.

65.     The Underlying Lawsuit was tried before a jury for approximately twenty-two days during May and June of 2023.

66.     Two of the defendants, Ridgeline Mechanical Sales, LL.C. and Harrington Industrial Plastics, Inc., settled and were dismissed prior to trial, thus leaving Aquatherm GmbH and the Aquatherm U.S. Entities as the remaining defendants at trial.

67.     King County put on evidence and testimony of the alleged liability by Aquatherm GmbH and Aquatherm U.S. Entities and its claim for damages.

68.     As part of its evidence of liability of the Aquatherm U.S. entities, King County called Steven Swinburne, King County's former Project Manager for King County Facilities Management Division, and Mr. Swinburne testified regarding meetings he and others with King County had regarding evaluating piping materials and the decision to use Aquatherm Pipe in the KCCF.  *See* Trial Transcript, dated May 25 and 30, 2023, Testimony of Steven Swinburne, pp. 1988-2036 and 2183-2213, a copy of which is appended hereto as Exhibit G.

69.     Mr. Swinburne testified about meetings he had with Aquatherm's representatives:

Q.   did you meet with Aquatherm's representatives during the course of your evaluating piping material alternatives for the re-pipe project.

A.  Oh yes, I did.  Several instances we met with Ridgeline, Ridgeline Mechanical, who gave us an in-person presentation and offered also written material in the Aquatherm piping materials.  They also thermally welded an Aquatherm pipe in person right there in the meeting.  We also met with the U.S. president of Aquatherm, the branch that's in the U.S. in Utah; Steve Clark was his name.  And he met also with me and my team and spent a long time with him with questions and answers about the Aquatherm piping materials that they manufactured.

30

> Q.   What did you learn through the presentations and meetings you had with Aquatherm representatives?
>
> A.   Well, I learned that this piping material had been invented in '74 was -- it easily adapted to other piping systems and equipment, that it was excellent in preventing leaks and failures.  And really, probably the most important issue we've already talked about is a long lifespan.  And we learned that Aquatherm pipe would have a lifespan of 50 years or more, and that is – that's most unusual compared to any other piping materials.

*Id*. at pp. 1997-1998, Exhibit G.

70.     Mr. Swinburne also testified of other communications he and others with King County had with Mr. Clark and other representatives of the Aquatherm U.S. Entities.  *See id*. at pp. 2004, 2193-2194, Exhibit G.

71.     As to damages, King County (based primarily on the trial testimony of Mr. Maus) put on evidence and testimony before the jury of: 1) Its claim of current damages for recovery of $18,063,850, for the cost of the Project to remove and replace the PRP/Aquatherm Pipe; and 2) Its claim of future damages for the need for another project for re-piping the domestic water distribution system in twenty-five years based on the sales claims and its reasonable expectation that the PRP/Aquatherm Pipe had a fifty to sixty year life-span, the remainder life of the KCCF building.  *See* Trial Transcript, dated June 8, 2023, Testimony of Ronald Maus, pp 3243-3327, a copy of which is appended hereto as Exhibit H.

72.     Mr. Maus' testimony at trial was, for the most part, consistent with the opinions he provided in his Updated Expert Report, including the circumstance that King County was not seeking recovery of past damages, which was money the County spent to make repairs and address the problems that the leaking pipes cost them prior to undertaking the Project to completely replace

the PRP/Aquatherm Pipe.

73.     As to the category of past damages, Mr. Maus provided the following testimony:

Q.  Understood.  So let's start with past damages.  Is that – can you describe, you know, what you would consider to be in that category?

A.  Well, the County did undertake 117 or so internal work orders to react to and respond to leaks and issues that had to do, in their view, with the Aquatherm product.  Unfortunately, however, when I was asked to do this work and the pandemic was on, the County didn't have the resources to help us.  That is, they didn't have anyone working at the County's offices there that could provide to us the printouts for the costs of those 117 different work orders, and then we would have asked for because I feel it is my responsibility.   I don't just accept the number, I look at the detail of it and see what was there.  We weren't going to be able to get any invoice back-ups or timesheet information from County employees that responded to these things.  So I concluded that I couldn't sit here before the jury and come up with a number with any comfort on my part.  So it's zero.  I'm not here to ask for money on behalf of the County for that.  The County could not facilitate our work and so unfortunately I can't come up with a number.

*Id*. at 3254-3255, Exhibit H.

74.     The trial in the Underlying Lawsuit concluded and was submitted to the jury on June 29, 2023.

75.     The jury found liability against Aquatherm GmbH and two of the three Aquatherm U.S. Entities, being, insured Aquatherm, Inc. and insured Aquatherm NA L.C.  *See* Verdict Form, executed June 29, 2023, a copy of which is appended hereto as Exhibit I.

76.     Under the first cause of action for violation of the Washington Product Liability Act, the jury found that insured Aquatherm, Inc. and insured Aquatherm NA L.C. were negligent and breached an express warranty which were a proximate cause of injury or damage to King County.  The jury also found Aquatherm GmbH liable for violating the Washington Product

Liability Act.  *See* Verdict Form at pp. 1-2, Exhibit I.

77.     The jury awarded damages for violation of the Washington Product Liability Act of $18,063,850.00.  *See id.* at p. 3, Exhibit I.

78.     Under the second cause of action, the jury found that Aquatherm GmbH, Aquatherm, Inc. and Aquatherm NA L.C. violated Washington's Consumer Protection Act, such violation was the proximate cause of injury to King County and awarded damages of $18,063.850.00.  *See id.* at pp. 4-5, Exhibit I.

79.     Following the trial, the Court found an award of $25,000 in treble damages against Aquatherm GmbH, Aquatherm, Inc. and Aquatherm NA L.C. under the Washington's Consumer Protection Act.  *See* Order Re: Judgment on Jury Verdict at pp. 1-3, a copy of which is appended hereto as Exhibit J.

80.     The Judgment in the amount of $18,088,850 was entered on August 8, 2023 against Aquatherm GmbH, Aquatherm, Inc. and Aquatherm NA L.C. jointly and several, and an award of interest from the date of the entry at a rate of 12% per annum.  *See* Judgment, a copy of which is appended hereto as Exhibit K.

81.     Upon information and belief, Aquatherm GmbH, Aquatherm, Inc. and Aquatherm NA L.C. intend to appeal the Judgment.

82.     Upon information and belief, AEIC and ZAIC have informed the Aquatherm U.S. Entities that they will continue to defend them in the appeal while this action is proceeds.

83.     Upon information and belief, King County intends and will take efforts to enforce the Judgment against the Aquatherm U.S. Entities.

**FIRST CAUSE OF ACTION**
**REQUEST FOR DECLARATORY RELIEF**
**(Absence of Coverage under the BOP Policies for the Claims**
**And Judgment Entered In The Underlying Suit)**

84.     AEIC and ASIC adopt by reference the allegations of Paragraphs 1 through 83 of the foregoing Complaint, as though fully set forth herein.

85.     An actual dispute and controversy has arisen between AEIC and Defendants regarding insurance coverage under the BOP Policies for the claims alleged and tried and the Judgment entered in the Underlying Suit.

86.     AEIC contends that it does not owe liability coverage to the Aquatherm U.S. Entities under any of the BOP Policies for the Underlying Suit because:

(a) The Judgment Entered in the Underlying Suit in favor of King County against the Aquatherm U.S. Entities concerns only liability for damages for replacement of the defective PRP/Aquatherm product and such liability and damage does not trigger or constitute "'property damage' caused by an 'occurrence'" under the BOP Policies; and therefore AEIC does not owe indemnification or a continued defense to the Aquatherm U.S. Entities.

(b) The Judgment Entered in the Underlying Suit in favor of King County against the Aquatherm U.S. Entities concerns only liability for damages for replacement of the defective PRP/Aquatherm product and such liability and damage fall within the scope of the BOP Policies' exclusions concerning "property damage" (exclusion k.), "impaired property" (exclusion n.), "your product" (exclusion l.),  "your work" (exclusion m.), and

34

"recall" (exclusion o.); and therefore AEIC does not owe indemnification or a continued defense to the Aquatherm U.S. Entities.

(c) The Judgment Entered in the Underlying Suit in favor of King County against the Aquatherm U.S. Entities concerns only liability for damages which were known by the Aquatherm U.S. Entities before all of the BOP Policies' policy periods (or alternatively under one or more of the BOP Policies) and are precluded from coverage under the BOP Policies' insuring provisions or alternatively under the known loss doctrine.  Therefore AEIC does not owe indemnification or a continued defense to the Aquatherm U.S. Entities.

87.    A judicial determination is necessary and appropriate at this time to determine the rights and duties of AEIC as to the Aquatherm U.S. Entities under the BOP Policies.

88.    Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, AEIC seeks a judicial declaration that: 1) it does not owe a continued duty to defend or indemnify the Aquatherm U.S. Entities under the BOP Policies for the Underlying Suit; and 2) AEIC can withdraw and cease paying defense costs for the Aquatherm U.S. Entities.

**SECOND CAUSE OF ACTION**
**REQUEST FOR DECLARATORY RELIEF**
**(Absence of Coverage under the Excess Policies for the**
**Claims And Judgment Entered In The Underlying Suit)**

89.    AEIC and ASIC adopt by reference the allegations of Paragraphs 1 through 88 of the foregoing Complaint, as though fully set forth herein.

90.     An actual dispute and controversy has arisen between ASIC and Defendants regarding insurance coverage under the Excess Policies for the claims alleged and tried and the Judgment entered in the Underlying Suit.

91.     ASIC contends that it does not owe liability coverage to the Aquatherm U.S. Entities under any of the Excess Policies for the Underlying Suit because:

(a) The Judgment Entered in the Underlying Suit in favor of King County against the Aquatherm U.S. Entities concerns only liability for damages for replacement of the defective PRP/Aquatherm product and such liability and damage does not trigger or constitute "'property damage' caused by an 'occurrence'" under the Excess Policies; and therefore ASIC does not owe indemnification or a defense to the Aquatherm U.S. Entities.

(b) Alternatively, the Judgment Entered in the Underlying Suit in favor of King County against the Aquatherm U.S. Entities concerns only liability for damages for replacement of the defective PRP/Aquatherm product and such liability and damage and fall within the scope of the Excess Policies' exclusions concerning "property damage" (exclusion M.), "impaired property" (exclusion P), "your product" (exclusion W),  "your work" (exclusion O), and "recall" (exclusion Q); and therefore ASIC does not owe indemnification or a defense to the Aquatherm U.S. Entities.

(c) The Judgment Entered in the Underlying Suit in favor of King County against the Aquatherm U.S. Entities concerns only liability for damages which were known by the Aquatherm U.S. Entities before all of the Excess Policies' policy periods (or alternatively under one or more of the Excess Policies) and are precluded from coverage under the

Excess Policies' insuring provisions or alternatively under the known loss doctrine. Therefore, ASIC does not owe indemnification or a defense to the Aquatherm U.S. Entities.

92.     A judicial determination is necessary and appropriate at this time to determine the rights and duties of ASIC as to the Aquatherm U.S. Entities under the Excess Policies.

93.     Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, ASIC seeks a judicial declaration that it does not owe a duty to defend or indemnify the Aquatherm U.S. Entities under the Excess Policies for the Underlying Suit.

**THIRD ALTERNATIVE CAUSE OF ACTION**
**REQUEST FOR DECLARATORY RELIEF**
**(Allocation of Coverage As Between the Insurers Should There be a**
**Declaration of Coverage as between AEIC and ZAIC or ASIC and AGLIC)**

94.     AEIC and ASIC adopt by reference the allegations of Paragraphs 1 through 93 of the foregoing Complaint, as though fully set forth herein.

95.     An actual dispute and controversy has arisen between AEIC, ASIC and Defendants ZAIC and AGLIC regarding allocation of insurance coverage should this Court find that AEIC and/or ASIC owe indemnification coverage under any of their respective Policies to the Aquatherm U.S. Entities and should this Court find that Defendants ZAIC and/or AGLIC also owe coverage under any their respective Policies.

96.     The determination of the allocation of insurance coverage as between the insurers will concern which and how many Policies are triggered by the claims and/or Judgment in the Underlying Suit and the insurers' time on the risk.

97.     A judicial determination is necessary and appropriate at this time to determine the rights and duties of allocation of coverage as between the insurers under their respective policies for the Underlying Suit and the Judgment entered in the Underlying Suit.

98.     Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, AEIC and ASIC seek an alternative judicial declaration regarding allocation of insurance coverage for the Underlying Suit and the Judgment entered therein, should this Court find that AEIC and/or ASIC owe indemnification coverage under their respective Policies to the Aquatherm U.S. Entities and should this Court find that Defendants ZAIC and/or AGLIC also owe coverage under their respective Policies.

**WHEREFORE** AEIC and ASIC pray for judgment in their favor and against Defendants as follows:

1.     For a declaration on the First Cause of Action that AEIC is not obligated to continue defending or indemnify the Aquatherm U.S. Entities under the BOP Policies for the Underlying Suit and the Judgment entered within the Underlying Suit in favor of King County against the Aquatherm U.S. Entities.

2.     For a declaration on the Second Cause of Action that ASIC is not obligated to defend or indemnify the Aquatherm U.S. Entities under the Excess Policies for the Underlying Suit and the Judgment entered within the Underlying Suit in favor of King County against the Aquatherm U.S. Entities.

3.     For a declaration on the Third Alternative Cause of Action regarding the allocation of insurance coverage for the Underlying Suit and the Judgment entered therein, should this Court

find that AEIC and/or ASIC owe indemnification coverage under their respective Policies to the Aquatherm U.S. Entities and should this Court find that Defendants ZAIC and/or AGLIC also owe coverage under their respective Policies.

4. For all other relief to which AEIC and ASIC may be entitled.

Dated this __15th__ day of August, 2023.

CHRISTENSEN & JENSEN, P.C.


/s/ *Rebecca L. Hill*
Rebecca L. Hill
*Attorneys for Plaintiff American Economy Insurance and Company and American States Insurance Company*

39